HOUSTON ELECTRIC CO. v. MAYOR AND CITY COUNCIL OF CITY OF HOUSTON. (No. 7804.) *

(Court of Civil Appeals of Texas. Galveston. March 27, 1919. Dissenting Opinion, April 4, 1919. Rehearing Denied April 10, 1919.)

1. APPEAL AND ERROR ⊚⇒954(1) — INJUNCTION ⊚⇒135—DISCRETION OF TRIAL COURT —REVIEW.

The granting or refusing of a temporary injunction is largely within the sound discretion of the trial court, the exercise of which will not ordinarily be interfered with upon appeal, unless there has been a clear abuse of power.

2. INJUNCTION ⊚⇒144—TEMPORARY INJUNCTION—PLEADING—CONSTRUCTION.

A bill asking for temporary injunction, contrary to the rule in ordinary actions, will be taken most strongly against the applicant, and must negative any reasonable inference from the facts stated that he may not be entitled to the recovery sought.

3. INJUNCTION ⊚⇒119—MANDAMUS ⊚⇒164(3) —PLEADING ⊚⇒129(1)—ADMISSIONS — FAILURE TO DENY.

In a proceeding in which an injunction and mandamus is sought, submitted on bill and answer, allegations of the bill not specially denied under oath must be taken as true.

4. MUNICIPAL CORPORATIONS ⊚⇒63(1)—ORDINANCES—REVIEW BY COURT.

A city council, when acting upon subjects over which it has the power to legislate, is an entirely independent lawmaking body, and cannot be interfered with or subjected to inquiry by the courts as to its motives, reasons, or purposes in enacting ordinances.

5. APPEAL AND ERROR ⊚⇒856(1)—REVIEW OF JUDGMENT BASED ON ERRONEOUS GROUND.

If a decree refusing to grant an injunction was permissible under the verified pleadings of the parties, and did not constitute a clear abuse of discretion, its validity is not affected, nor will it be reversed on appeal, merely because the trial court based his decision upon an erroneous ground.

6. CARRIERS ⊚⇒12(5)—STREET RAILWAY COMPANIES—ORDINANCES FIXING RATES—CONFISCATION—REASONABLENESS.

In order to enjoin enforcement of an ordinance reducing fares to be charged by a street railway, it was not incumbent upon the railway company to show that the reduced rate was confiscatory within the meaning of the federal Constitution, being entitled to restrain its enforcement, where the reduced rate is unreasonable, unjust, and insufficient to maintain a fair return upon the value of the property.

7. CARRIERS ⊚⇒12(5) — STREET RAILWAYS— FARES—REASONABLENESS.

In a proceeding by a street railway to restrain a city from enforcing an ordinance reducing fares, bill *held* not to show that reduced fare was unreasonable, unjust, or insufficient to maintain and pay a fair return upon the value of the property.

8. INJUNCTION ⊚⇒146 — MOTION ON PLEADINGS—EFFECT OF ANSWER.

On motion for an injunction made on bill and answer, statements made under oath in the answer, where responsive to the bill, will be taken as true, and if in such answer, under oath, the facts constituting the claim of the plaintiff for the interposition of the court are controverted by defendant, the court will not generally interfere, but will deny the injunction.

9. CARRIERS ⊚⇒18(6) — RATES — MUNICIPAL ORDINANCES — STREET RAILWAYS—INJUNCTION.

Where, on account of the war, a city passed an ordinance increasing street railway fares, it cannot be said that the court abused its discretion in refusing an injunction to restrain city from enforcing an ordinance repealing the ordinance, where the city officials made affidavit that after armistice was signed most of material necessary for operation of street railway had declined, and that conditions which impelled council to grant temporary relief had ceased to exist, and that the "jitney" menace had then become so nearly obliterated that earnings of company had reached practically the highest point in its existence, the street railway not having shown in its bill the actual statistics to support its allegation that the normal fare was unreasonable.

Pleasants, C. J., dissenting.

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted, October 15, 1919.

Appeal from District Court, Harris County; Henry J. Dannenbaum, Judge.

Suit by the Houston Electric Company against the Mayor and City Council of the City of Houston. Judgment for defendant, and plaintiff appeals. Affirmed.

C. R. Wharton, of Houston, for appellant.

W. J. Howard and Kenneth Krahl, both of Houston, for appellee.

GRAVES, J. This appeal proceeds from an order entered in chambers by the judge of the Sixty-First district court refusing the Houston Electric Company's application for a temporary injunction and for a peremptory writ of mandamus. By that means the company had sought to have the mayor and city council of the city of Houston not only restrained from enforcing an ordinance of November 6, 1918, fixing street car fares upon its lines at five cents, and from interfering with it in collecting instead six-cent fares, claimed to be permissible under a prior ordinance of September 19, 1918, but also required through the writ of mandamus to exercise their judgment and discretion as manifested in this last-mentioned ordinance, and not to attempt to delegate their rate-making powers to any other agency. In other words, the objective was to have the five-cent fare enactment declared invalid and inoperative, and that prescribing six cents held to be and kept effective in place of it.

No evidence was offered, the hearing being solely upon the petition of the Electric Company and the answer of the city, both of which were verified by affidavit, the court's judgment thereon being couched in these terms:

"In Chambers.

"On this February 10, 1918, came on to be heard in chambers the petition of the plaintiff for injunction and peremptory writ of mandamus, and the court having heard and considered the plaintiff's bill for injunction and mandamus, and no evidence being offered to show that the rate fixed in the ordinance of November 6, 1918, was confiscatory within the meaning of the federal Constitution, the court is of the opinion that the plaintiff should be denied all and singular the relief asked in said bill, and the application for temporary injunction and mandamus is hereby in all things refused and denied, to which judgment the plaintiff then and there in open court excepted and gave notice of appeal to the Court of Civil Appeals at Galveston.

"Henry J. Dannenbaum, Judge."

Before special consideration of the particular case presented, however, it may not be amiss to bear in mind at least two well-settled general principles applicable to preliminary or temporary injunctions:

[1] (1) The granting or refusal of them is a matter that rests very largely within the sound discretion of the trial court, the exercise of which will not ordinarily be interfered with upon appeal; not, indeed, unless there has been a clear abuse of power. S. O. & G. Co. v. M. O. & G. Co., 186 S. W. 446; 14 Ruling Case Law, p. 312, pars. 11 and 12.

In the Oil & Gas Company Case cited this rule is thus stated by the Court of Civil Appeals at Dallas:

"The granting of a temporary injunction is a matter resting very largely in the sound discretion of the court, and its refusal, especially when asked for on the sworn petition of the complainant unsupported by other testimony, will not be disturbed on appeal, unless it clearly appears that such discretion has been abused."

[2] (2) The averments of the bill by which so drastic a remedy is asked, contrary to the rule in ordinary actions, will be taken most strongly against the applicant, and must negative any reasonable inference from the facts stated that he may not be entitled to the recovery sought. Miller v. City, 204 S. W. 1174 (2); Ross v. Veltmann, 161 S. W. 1073, and cited authorities.

The sworn pleadings of the parties having thus exclusively formed the basis for the action below, under application of the two familiar rules mentioned, the sole question upon appeal must be: Did the appellant's bill, after proper appraisement of the effect of the city's answer, so clearly show it entitled to the extraordinary writs prayed for as deprived the district judge of all discretion in the matter and required the granting thereof as a matter of right?

By appropriate assignments, and through distinguished counsel, the Electric Company very ably presents in this court two main contentions:

(1) "It appears from the undisputed facts recited in plaintiff's bill that the ordinance passed on the 6th day of November, 1918, repealing the six-cent fare ordinance passed on the 19th day of September, 1918, and the further ordinance passed on November 6, 1918, re-enacting the five-cent fare ordinance, were arbitrary, unreasonable, and unjust, and, this fact being made to appear by recitations in plaintiff's bill which are undisputed, this court should have granted the temporary injunction as prayed for."

(2) "The trial court should have granted a mandamus, because the city council had fully exercised and exhausted its discretion in passing the ordinance of September 19, 1918, and it was its duty to carry out that discretion, and not delegate it to some one else. Where the thing to be done imposes a positive and absolute duty, a mandamus will lie to compel performance of that duty."

[3] While in the condition of the record here neither of these positions is thought to be well taken, it is deemed preferable to dis-

pose of them in an order inverse to that of their statement. The material allegations of the bill—in the view here taken upon that feature of the case—relating to the passage by the city council of the two ordinances involved, which are not specially denied under oath, and must therefore be taken as true, may be quickly stated: On September 19, 1918, the council passed the first of these ordinances, fixing fares which might be charged at six cents, in lieu of the pre-existing rate of five cents, section 3 thereof being as follows:

"The rate of fare fixed in the last two preceding sections shall become effective on and after September 30, 1918, midnight, and be lawful until January 1, 1919, and thereafter until same shall be changed by proper orders of the city council of the city of Houston, and the city, on passing this ordinance and permitting these fares, reserves the right to regulate and change such fares, either increasing or diminishing the same as future conditions may warrant, and such changes shall be made from time to time as seems fair and just to the said council after giving notice for at least ten days to the person, firm, or corporation affected by said change."

On the date of its passage the mayor and city commissioners issued a statement, saying that the ordinance had been passed for the temporary emergency relief of the company during the war, on account of the increased cost to it of labor and materials occasioned by war conditions. Thereafter, and before it became by its terms effective, pursuant to articles 7a and 7b of the 1913 amendment to the Houston City Charter of 1905, known as the initiative and referendum clauses, this ordinance was first suspended, and the question of whether it should become effective at all then submitted to a popular vote of the qualified voters of the city, a majority of whom declared against it. Thereupon, on November 6, 1918, the next day after this election, the council repealed the six-cent ordinance, and re-enacted the old one, carrying the five-cent rate. No reason, however, was recited therein for the passage of the two latter enactments, and no reference was made to any vote of the people as an inducing cause, there being merely recitations that an emergency requiring their final passage on that date existed.

Further public statements of the mayor and different members of the council from time to time between the passage of the six-cent fare ordinance on September 19th and the election held on November 5th, purporting to give the reasons of those officials for passing that ordinance, and particularly quoting the mayor as having said on the eve of the election that the city council would treat and observe its result as an instruction in the matter, were attached as exhibits to the petition.

[4] The Electric Company's claim that, in the circumstances thus presented, it was entitled to a decree of the court declaring the six-cent fare ordinance to be still in full force and effect, and ordering through the requested writs its observance as such by the city council—notwithstanding the temporary character and the formal repeal thereof in the manner shown, not to mention the adverse vote of the people thereon—is merely tantamount to saying that the court could control the exercise by that body of its legislative function. We do not understand that to be the law. Upon the contrary, in so far as the passage of ordinances is concerned, as distinguished from the matter of their enforcement, our understanding is that it has been uniformly held that a city council, when acting upon subjects over which it has the power to legislate, is an entirely independent lawmaking body, and cannot be interfered with nor subjected to inquiry by the courts as to its motives, reasons, or purposes in enacting ordinances. 14 Ruling Case Law, p. 437, par. 139; Gray v. Lumber Co., 197 S. W. 233 (3); McQuillin on Municipal Corporations, vol. 2, p. 1527, par. 703 et seq.; City of Dallas v. Railway, 105 Tex. 337, 148 S. W. 292.

By its express terms this six-cent fare ordinance was for emergency purposes and only to remain in effect until January 1, 1919, or until changed by the city council. That having been done on November 6, 1918, before the filing of this suit, the resulting situation was the same as if it had never been passed by the council, and, under the authorities last cited the court was without power to enter the legislative domain exclusively occupied by the city's lawmaking body, and compel the re-enactment of a measure it had just repealed.

This conclusion eliminates all issues raised as to the validity and effect of the referendum election, or as to whether it may have induced or contributed to the repealing act of November 6th, and obviates any necessity for determining whether the city council could have lawfully delegated its rate-making power to the qualified voters of the city at large.

If, then, the city council was in the proper exercise of its legislative prerogative in repealing the ordinance thus temporarily and provisionally permitting the increased rate and in re-enacting that carrying the lower one, should the court nevertheless have enjoined, pending a full hearing upon all the facts, the enforcement of the five-cent rate, merely upon the company's claim, as embodied alone in its sworn application, that such a rate was unreasonable, unjust and not sufficient to enable it to pay operating expenses, keep up its property, and pay a fair return upon its investment?

This presents a question not without its difficulties. The learned trial judge, as the terms of his above-quoted order disclose, gave as his reason for denying the relief asked for that appellant had presented no evidence showing the five-cent rate to be confiscatory within the meaning of the federal Constitution. Even if it be conceded, as we think must be done, that refusal of the injunction asked could not properly be grounded upon that consideration alone, the judgment would not on that account necessarily be wrong, but might, and a majority of the court think did, present an instance of an insufficient reason being given for a correct decision. Texas B. Co. v. Henry, 197 S. W. 227 (10), 4 C. J. par. 2557; Calvin v. Neel, 191 S. W. 791.

[5] In other words, if the decree entered was a permissible one under the verified pleadings of the parties, and did not constitute a clear abuse of a rather far-reaching discretion, its validity is not affected, nor will it be reversed upon appeal, merely because the trial court based his decision upon an erroneous ground. Corpus Juris, vol. 4, par. 2557, footnotes 92 and 97 and collated authorities.

[6] As already indicated, it is not thought to have been incumbent upon the Electric Company to show the five-cent rate to be confiscatory within the meaning of the federal Constitution, but that it would have been entitled to restrain its enforcement, had it actually shown that rate to be unreasonable, unjust, and insufficient to maintain and pay a fair return upon the value of the property. As we understand the authorities, such is now the accepted rule. Dillon on Municipal Corporations, vol. 1, §§ 589, 591; City of Austin v. Cemetery Ass'n, 87 Tex. 338, 28 S. W. 528, 47 Am. St. Rep. 114; Railway v. City of Dallas, 98 Tex. 417, 84 S. W. 648, 70 L. R. A. 850; City of Brenham v. Seelhorst, 153 S. W. 348; Royal Indemnity Co. v. Schwartz, 172 S. W. 583.

[7] Did appellant's bill declare upon such a plain, clear, and independent case of that character as left the trial court, in the exercise of a sound judicial discretion, after giving due weight to the answer of the appellees, no alternative than to grant it? We think not, mainly upon these considerations: From preamble to invocation the bill may be finely combed without discovery of a single direct, unequivocal, and independent general averment, even that the five-cent rate was at that time, December 27, 1918, unreasonable, and not sufficient to enable the company to pay operating expenses, keep up its property, and have a fair return upon its investment; much further is it from containing a full, clear, and plain statement of any specific and then existing facts claimed to show such a result to be then flowing from operation under that rate as an actual consequence. The nearest approach to such an averment is found in paragraph 19, reading as follows:

"The plaintiff further alleges that the ordinance passed by the city council of the city of Houston on November 5, 1918, repealing the six-cent fare ordinance and copied in paragraph eleven thereof, and the ordinance passed by the city council on the same date and copied in paragraph twelve hereof, are part and parcel of the same transaction, and grew out of, and are inseparately connected with, the prior ordinance of September 19, copied in paragraph eight hereof; that it conclusively appears from the face of these proceedings and from the recitations in these ordinances that both of the ordinances passed and enacted on November 6th are unreasonable and arbitrary and wrong, and that they deprive this plaintiff of a common right, to wit, the right to earn a sufficient sum of money to pay operating expenses and keep up its property and to have a fair return upon its investment."

It thus appears that the dominating allegation and idea throughout the entire petition is that the acts repealing the six-cent rate and reinstating the old five-cent one are shown to be unreasonable by the recitations of the six-cent fare ordinance itself, of which they are said to be in reality part and parcel, and not by reason of any present, independent, and outstanding facts; indeed, this is necessarily the effect of the quoted averment, because, as previously indicated, neither of these two acts of November 6th contained any reference to the passage of the one of September 19th fixing the fare at six cents, or the statement of any other matter which could possibly make either unreasonable upon its face, both merely reciting that an emergency demanded their immediate passage, while that last mentioned, the one of September 19th, did contain, among similar ones, the statement that "the said company is not receiving from the present rate of fares sufficient return to pay its operating expenses and maintain its property in an efficient condition."

So that the net purport of this pleading is an assertion that appellant was on February 10, 1919, the date of the hearing, entitled to restrain the enforcement of a regularly enacted and in itself unobjectionable public ordinance of the city of Houston of November 6, 1918, fixing street car fares at five cents, as being unreasonable, solely because a provisional measure of September 19, 1918, which never became effective by reason of its subsequent repeal, recited in its preamble that the Electric Company was at that time not receiving from the rate then prevailing enough to pay operating expenses and keep up its property.

The only other parts of the bill cited in the arguments in this court as presenting allegations of unreasonableness are para-

graphs 6 and 7 and that portion of 20 reading as follows:

"The plaintiff avers that there was no change in the condition of affairs discussed in its application of September 4th, set out in the 7th paragraph hereof, between that date and the 6th of November, 1918; that all the unfavorable and adverse conditions surrounding the operation of its properties with reference to the price of labor and material obtained on the last date as they did on September 4th; that there has been no change of these conditions since that time; that the temporary cessation of hostilities and the approach of peace has not bettered any of these conditions, or reduced any of these prices, or in any way reduced operating expenses for the plaintiff company."

But here again the averment proves to be, not a direct and plain statement of any then subsisting facts rendering the five-cent fare ordinance of November 6th unreasonable when standing alone, but merely links in a narrative chain of allegations constituting in final substance a charge that it was shown to be so upon the face of the group of ordinances of which it was said to be a part and parcel; that is likewise necessarily the boiled down effect of this part of the petition also, because, when preceding paragraph 7 is looked to, to determine what was there set out about "the condition of affairs discussed in its application of September 4th," it is found to contain a mere recitation that the city authorities, following the filing of its application for increased rates of June 1, 1918, had a full inquiry into the facts therein stated and into its affairs made, and while that application was still pending undisposed of, the company addressed a further petition to the city council in which certain statements, copying them at length, were contained. That is all; nowhere does "a plain and intelligent statement," to use the language of our statute, appear that any particular facts contributing to the conditions it thus directly avers it discussed in the applications to the city council of June 1 and September 4, 1918, were at that very time still existing, and that these specific and then prevailing things were such as would render enforcement of the five-cent rate an unreasonable invasion of appellant's common rights.

The same thing may be said of paragraph 6, the first recitation of which is this:

"That because of the advances in wages and increase in prices and other unfavorable operating conditions which beset the company, it applied to the city of Houston on June 1, 1918, for an increase in fares of from five to six cents for adult passengers, and to three cents for half fares, filing with the city the following formal application for increase in fares."

It then concludes with setting out a full copy of the statement referred to of date June 1, 1918, purporting to show a deficit in the operations for 1918 of $131,000, without further averment of any kind.

It may have been in the mind of the pleader to charge that all the detailed and statistical conditions "discussed" in the company's application to the city council of June 1 and September 4, 1918, respectively, obtained in unchanged measure and form on December 27, 1918, when the bill was filed, and on February 10, 1919, when it was presented to the court, and that the indulgence of every fair inference and reasonable intendment in its favor would give it that effect; but, under the rules of pleading applying in injunction suits, that may not be done.

Aside, however, from the mere form of its pleading here, and looking to the grounds on which the company thus in June and September of 1918 asked the privilege of increasing the rates of fare, it is disclosed that the only causes assigned for its inability to meet operating expenses were:

(1) That for the years 1914 to 1918, inclusive, the operation of "jitneys" in competition with it reduced its earnings in certain specified sums for each year.

(2) That since the beginning of the World War the cost of materials and labor used by it had continuously and rapidly increased, and that the added amounts paid its employés in wages since January 1, 1915, aggregated $363,876 per annum.

There is no specification as to the amounts or proportions by which the cost of material had increased, while, as to the advances in wages of employés, it is positively averred in paragraph 8 of the bill that these were granted solely because of the passage of the six-cent fare ordinance, and neither could nor would have been accorded but for that action; but it is nowhere alleged either that the properties could not be operated without payment of such increases, or that they might not have been reduced following repeal of the ordinance.

To meet the case presented, as thus in substance outlined, the city, after demurrers, special exceptions, and a general denial upon information and belief that the aggregate value of the company's properties was as alleged, interposed the following special answer, verified by the mayor's affidavit:

"V. Further answering, these defendants deny the allegations in paragraph 20 of plaintiff's bill, that there has been no change in conditions of affairs discussed in said bill and affecting the cost of operating the said street railway since September 4, 1918, and says that the fact is that the said ordinance of date September 19, 1918, was passed for the purpose of granting temporary relief to the plaintiff on account of the temporary conditions brought about by war that was then in progress; that since said date the armistice has been signed and hostilities have ceased, and some, if not all, of the material necessary for the operation of said

street railways have declined in price; and these defendants have reason to believe that the conditions will be much more favorable in the near future, and that the purposes which moved and impelled the council to pass the said ordinance of September 19, 1918, have now ceased to exist.

"VI. Further answering, these defendants say that it is a fact, as appears from plaintiff's bill, that its difficulty in realizing sufficient earnings was brought about and occasioned by what is known as the jitney competition that began in the latter part of the year 1914, and continued during the years 1915, 1916, 1917, and 1918, but that since the year 1915 such competition has greatly decreased, until at this date it amounts to but very little, and the earnings of the company have again reached its highest point, or practically the highest point, in its existence; and with the increased earnings brought about by the elimination of such jitney competition, and the probability of falling prices due to the cessation of hostilities and the termination of the war, the said plaintiff should and could be able to earn sufficient to pay its fixed charges, set aside a reasonable replacement fund, and pay a reasonable net earning upon the amount invested."

Even if it were conceded, as appellant insists must be done, but in which position we are unable to concur, that as a special denial under oath this answer is insufficient to "swear away the equities of the bill," under the rule announced in McAmis v. Railway Co., 184 S. W. 332, and authorities there cited, still it did state facts, we think, clearly bringing it within this further rule quoted by the court in that opinion.

[8] "On motion for an injunction made on bill and answer, statements made under oath in the answer, where responsive to the bill, will be taken as true, and, if in such answer under oath the facts constituting the claim of the complainant for the interposition of the court are controverted by defendant, the court will not generally interfere, but will deny the injunction." 22 Cyc. 945, 946.

[9] In other words, if at the time of trial, February 10, 1919, the war had ended, most of the material necessary for the operation of the street railway had declined, the conditions which impelled the council to grant the temporary relief of September 19, 1918, had ceased to exist, and the "jitney" menace had then become so nearly obliterated that the earnings of the company had again reached practically the highest point in its existence, a state of things was interposed which required something more than the mere ipse dixit of the applicant therefor to entitle it to the far-reaching writ sought; to say the least, it is thought a refusal below, under such conditions, would not constitute a plain and clear abuse of the wide discretion so wisely vested in the trial court.

This court, therefore, must decline to interfere.

The judgment has been affirmed, with PLEASANTS, C. J., dissenting.

Affirmed.

PLEASANTS, C. J. (dissenting). I am unable to agree with my Associates in the conclusion that the judgment of the trial judge, refusing appellant's application for a temporary injunction, should be affirmed.

I concur in the opinion of the majority that the ordinance passed by the city council of the city of Houston repealing the ordinance of September 19, 1918, authorizing the appellant to collect a fare of six cents, cannot be questioned on the ground that in passing said repealing ordinance the council did not exercise its discretion, but surrendered its judgment and discretion in the matter to the dictation of a majority of the voters who voted in the referendum election upon the question of whether the six-cent ordinance should become effective. The fact that the six-cent ordinance was repealed in obedience to the expressed will of the majority of the voters at the referendum election is shown by the undisputed evidence, but in enacting the repealing ordinance the council exercised a power vested in it by the law, and this exercise of its legislative function cannot be interfered with by the courts on the ground that in passing the ordinance it acted from improper motives. The motives or influences inducing legislative action cannot be inquired into by the courts, except for the purpose of construing a legislative act. See authorities cited in majority opinion.

I also agree with counsel for appellant that the question of what is a just and reasonable fare to be charged for transportation of its passengers by the appellant is not one that can be properly determined by a popular vote. The nature of the question is such that its proper determination requires an investigation of facts, a consideration and weighing of evidence, and the exercise of an impartial, unbiased judgment, which could rarely, if ever, be obtained by submitting the question to a popular vote. As said by our Supreme Court in the case of Telephone Co. v. City of Dallas, 104 Tex. 121, 134 S. W. 323:

"In the exercise of the power to regulate and fix rates, etc., there must be a body who can hear evidence and decide upon the reasonableness and unreasonableness of the rate or regulation, and if that cannot be done by the initiative—the popular vote—then the authority cannot be exercised in that manner. Can it be necessary to offer argument to show to any man that such hearing as the law provides could not be had in a campaign before the electorate of the city? It is too manifest for controversy."

There is much force in appellant's contention that, the govermental function of fixing rates for public utilities having been delegated by the Legislature to the city council, it

cannot be redelegated by the council, and can only be exercised by the council. City of Corpus Christi v. Wharf Co., 8 Tex. Civ. App. 97, 27 S. W. 803.

While I am strongly inclined to the opinion that the referendum provisions of the charter of the city of Houston were not intended to apply and should not be invoked upon the rate-making power of the council, it is unnecessary to decide the question, because, as before stated, the city council, in the exercise of a power which cannot be questioned, has repealed the ordinance. It follows from this conclusion that I agree with the majority in the holding that the trial court correctly refused the mandamus prayed for by appellant. But the question of whether the six-cent ordinance is still in force or should be ordered reinstated is entirely different from the question of whether the appellant has shown itself entitled to relief against the enforcement by the city of the ordinance requiring it to charge only a fare of five cents.

There is no disagreement between the majority and myself as to the general principles which should control in the determination of this question.

If the operation of the ordinance will require appellant under the severe penalties therein provided, to furnish the means of transportation for the people of the city of Houston for a fare or rate of compensation insufficient to enable it to provide such means of transportation, and to earn a reasonable return upon the money reasonably invested by it in such undertaking, the ordinance should not be enforced. This proposition, which is only a specific application of the general principle that, except as a punishment for crime, no individual's property or labor should be taken or used for public benefit without fair compensation, is so just, so uniformly recognized in the laws of free peoples, and so embedded in our Constitution and laws, that citation of authorities in its support is unnecessary.

It seems to me that the majority opinion fails to give to the allegations of plaintiff's petition the effect and meaning which fair and reasonable interpretation of the language of the pleader requires.

The rule that the allegations of a bill for injunction, in order to entitle the applicant to the injunction, must be clear and plain, does not authorize a court, in order to justify a refusal of the injunction, to place a strained and unreasonable construction upon the allegations of the bill; but the common-sense rule that the allegations of the petition must be given the meaning which is reasonably and naturally conveyed by the language used applies with the same force to bills for injunction as to any other kind of pleading.

The petition, after reciting the various grants of franchise under which appellant is and has been for a number of years operating its street cars in the city of Houston, alleges that up to December 31, 1917, it had invested in establishing and improving its transportation system in said city the sum of $5,655,605, and that its properties on said date were reasonably worth said sum, and that until said date it had, under the fare it was permitted to charge, earned some annual return on its investments. It then alleges that in 1914 its gross earnings began to be reduced by competition from persons and companies operating jitneys over the streets of said city. These yearly reductions in gross earnings are stated to be: 1914, $28,000; 1915, $400,000; 1916, $300,000; 1917, $250; 1918, $175. It further alleges that since the beginning of the World War in 1914 there has been a continuous advance in the price of all the material required and purchased by it for the maintenance and operation of its business, and a much more rapid increase in the cost of such material, and in the wages paid its employés, has occurred since the entry of this country into the war in 1917, and that the increase in such wages alone since January, 1915, amounted to $363,876 per annum.

It then alleges that on June 1, 1918, it applied to the city council of the city of Houston for permission to raise the fares charged by it from five cents for adults and two and one-half cents for children to six and three cents, respectively, and in its said application, which is set out in full, it made a full itemized statement of its earnings and expenses of operation for the year 1918. The application containing this itemized statement is set out in full in the petition, and shows that that by the operation of the cars for the year named it cost the company $131,763 more than it earned. This application not having been acted upon by the city council, on September 4, 1918, appellant filed an additional application asking for a further increase in fares on the ground that since the filing of the first application the price of material had steadily increased, and that the company had been constrained, in order to satisfy its employés and give them a living wage under existing conditions, to increase said wages $54,000 per annum, and that the National War Labor Board had recommended a still further increase, which would cost the company approximately an additional $110,000, and that the company had stated to its employés that it desired to grant this increase, but was unable to do so unless its fares should be increased. In view of these additional demands upon the earnings of the company the council was asked to authorize a fare of seven cents for adults and three and one-half cents for children. It is also alleged that the "mayor and city commissioners caused a full, complete, and diligent inquiry

to be made into the affairs of the company, and in the facts recited in its petition of June 1, 1918," and thereafter, on September 19, 1918, the city council passed an ordinance amending the existing ordinance regulating street cars so as to authorize appellant to charge a fare of six cents for adults and three cents for children. This ordinance contains the following recitals:

"Whereas, the Houston Electric Company now owns and operates all the lines of street railway operated in the city of Houston and which will be affected by the following ordinance; and,

"Whereas, said company has applied to the city council of the city of Houston for an increase of fares to seven cents in order to meet financial conditions brought about by the war; and,

"Whereas, the city council, after full, careful, and complete investigation of the facts and conditions upon which said application is based, has found that, on account of the war, materials which the said company is required to purchase in order to operate said line of street railway have advanced in price from twenty-five per cent. to three hundred per cent. above normal and prewar prices, together with the fact that said company has granted to its employés several raises of wages during the present year on account of war conditions, and, further, in order to meet the scale of wages fixed for street railway employés by the War Labor Board it will be necessary to make a still further advance in said wages, whereby operating expenses of the said company will be very greatly increased, and the prewar scale of wages will be practically doubled, and that in view of these conditions the said company is not receiving from the present rate of fares sufficient return to pay its operating expenses and maintain its property in an efficient condition, and an emergency has arisen necessitating the granting in part of said petition of the company, and affording it temporary relief from the conditions set out in the following ordinance, in order to permit said company to meet said extraordinary and abnormal conditions.

"Now, therefore, be it ordained by the city council of the city of Houston," etc.

This ordinance, in addition to fixing the street car fares at six and three cents from and after September 30, 1918, until January 1, 1919, and thereafter until changed by the city council, contained provisions requiring the appellant to permit a representative of the city, to be selected by the city council, to have access at all times to the books and records of the company and be present at all meetings of the board of directors. It also prohibited any capital expenditures by the company without first consulting with the city council or its representatives, limited the dividends that might be paid to the stockholders, and provided that the city could at any time cause an appraisement and valuation of the properties of the company to be made at the expense of the

company for the purpose of ascertaining and fixing such fares as would be reasonable. The two last sections of the ordinance are as follows:

"Sec. 8. This ordinance shall not become effective until the said Houston Electric Company has filed with the city secretary an acceptance stating that it will pay the financial obligations imposed upon it by this ordinance.

"Sec. 9. There being a public emergency requiring that this ordinance be passed finally on the date of its introduction, and the mayor having in writing declared the existence of such emergency and requested such passage, this ordinance shall be passed finally on the date of its introduction, this the 19th day of September, 1918, and shall take effect immediately upon its passage and approval by the mayor."

This ordinance was approved by the mayor on the date of its passage, and thereafter, on September 21, 1918, appellant filed its acceptance in writing in compliance with section 8 of the ordinance before set out, and, believing that it would get the increase in fares provided in the ordinance, granted the request of its employés for the increase mentioned in its application.

Paragraphs 19 and 20 of the petition are as follows:

"The plaintiff further alleges that the ordinance passed by the city council of the city of Houston on November 6, 1918, repealing the six-cent fare ordinance and copied in paragraph eleven hereof, and the ordinance passed by the city council on the same date and copied in paragraph twelve hereof, are part and parcel of the same transaction, and grow out of and are inseparably connected with the prior ordinance of September 19th, copied in paragraph eight hereof; that it conclusively appears from the face of these proceedings and from the recitations in these ordinances that both of the ordinances passed and enacted on November 6th are unreasonable and arbitrary and wrong, and that they deprive this plaintiff of a common right, to wit, the right to earn a sufficient sum of money to pay operating expenses and keep up its property and to have a fair return upon its investment; that, since these facts conclusively appear on the face of the ordinances aforesaid, they are invalid, and the city council should be restrained from enforcing the five-cent fare ordinance, copied in paragraph twelve hereof, or from further attempting to change, set aside, or modify the ordinance of the 19th of September, 1918, until it is made to appear that such modification or changes therein are fair and just, and until notice of said proposed change has been given to this plaintiff as required by said ordinance."

"The plaintiff avers that there was no change in the condition of affairs discussed in its application of September 4th, set out in the seventh paragraph hereof, between that date and the 6th of November, 1918; that all the unfavorable and adverse conditions surrounding the operation of its properties with reference to the price of labor and material obtained on the last date as they did on September 4th; that there has been no change of these conditions since that time; that the temporary cessation of hos-

tilities and the approach of peace has not bettered any of these conditions, or reduced any of these prices, or in any way reduced operating expenses for the plaintiff company; that the plaintiff's manager and other persons interested in its properties have made diligent inquiry for the purpose of determining whether it is reasonably probable that there will be any improvement in these conditions, and, with the very best information obtainable, the plaintiff is led to believe that there will be no decrease in the price of labor during the ensuing year or two years, nor will there be any appreciable decrease in the price of materials or operating expenses of any character during the ensuing year; that the vast amount of men and material needed for reconstruction work at home and abroad will overload the capacity of the country to such an extent that this company cannot expect any reduction in the price of either labor or material in the near future; that, if any change whatever is brought about at the approach of peace, it will rather be a decrease in the earnings of this company because of the removal of the army camps from the vicinity of Houston, and the consequent loss of the patronage of the great number of soldiers who have been in these camps, and who have used the company's facilities of transportation during the last year; that the number of these soldiers has varied from 5,000 to 40,000, and their presence in the city of Houston and its suburbs has increased the fares which this company has received during this period of time; that their removal, which is now imminent, may materially decrease the company's income."

From the foregoing accurate statement of the allegations of the petition I think it clear that appellant does, in plain and explicit language, set out definite facts which show that under a five-cent fare it not only could not maintain and operate its transportation system in the city of Houston and earn any return upon the money invested therein, but that such maintenance and operation was costing the appellant, in money necessarily paid by it to fulfill its transportation obligations to the citizens of Houston, a sum largely in excess of its gross earnings. These allegations are not general, but specific. An itemized statement of the gross earnings, and the necessary expenditures of the company for the year 1918, is set out, and this statement shows that the deficit for that year was $131,763, without including an advance of wages to its employés made subsequent to June 1, 1918, of more than $100,000. This itemized statement showing the actual loss to appellant from the operation of its street car system was contained in the application made to the city council in June, 1918, for permission to charge a six-cent fare, and the council, which was then, as now, composed of the five citizens of Houston, who are the defendants in this suit, after, according to their own statement made under their official oath,

"full, careful, and complete investigation of the facts and conditions upon which said appli-

cation is based, has found that, on account of the war, materials which the said company is required to purchase in order to operate said line of street railway have advanced in price from twenty-five per cent. to three hundred per cent. above normal and prewar prices, together with the fact that said company has granted to its employés several raises of wages during the present year on account of war conditions, and, further, in order to meet the scale of wages fixed for street railway employés by the War Labor Board, it will be necessary to make a still further advance in said wages, whereby operating expenses of the said company will be very greatly increased, and the prewar scale of wages will be practically doubled, and that in view of these conditions the said company is not receiving from the present rate of fares sufficient return to pay its operating expenses and maintain its property in an efficient condition."

It was further expressly alleged—

"that there was no change in the condition of affairs discussed in its application to the city council of date September 4, 1918, between said date and November 6, 1918 (when the ordinance repealing the six-cent fare ordinance was passed); that all the unfavorable and adverse conditions surrounding the operation of its properties with reference to the price of labor and material obtained on the last date as they did on September 4th; that there had been no change of these conditions since that time."

Facts are then stated upon which the conclusion is based that the cost of material and operation will not decrease in the near future, and the earnings of the company will probably decrease.

I cannot see how there could well be more explicit and positive allegations of facts showing the unreasonableness and injustice of requiring the appellant to continue to operate its street cars under an ordinance prohibiting it, under severe penalties, from charging more than a five-cent fare. The fact that the proceedings of the city council, and the several ordinances set out in the petition, may not on their face show "that both of the ordinances passed and enacted on November 6th are unreasonable and arbitrary and wrong, and that they deprive this plaintiff of a common right, to wit, the right to earn a sufficient sum of money to pay operating expenses and keep up its property and to have a fair return upon its investment," does not destroy the effect of the other allegations of the petition before set out, nor is the effect of these allegations in any way lessened by the narrative form of the petition.

Before appellant was entitled to relief from the courts it was required to exhaust its remedy by appeal to the city council, and it was entirely proper to allege all of the proceedings had by it with the council. In order to do this, it properly set out in detail the facts presented by it to the council and the

action of the council on its application. After doing this, it alleged that the facts presented by it to the council still existed, and in addition thereto alleged other facts showing that it could not maintain and operate its cars for a fare of five cents without serious loss.

Unless the equities thus shown by the bill were sworn away by the answer of the defendant, appellant was entitled to relief, and I think appellees' answer was clearly insufficient to justify a refusal of appellant's application.

The only effect of a general denial in any case is to put plaintiff upon proof of the facts necessary to entitle him to relief, and, on application for temporary injunction, a sworn petition is sufficient proof. 22 Cyc. 942; Vernon's Sayles' Civil Statutes, art. 4649.

An answer sufficient to defeat the right to relief by temporary injunction must be positive in its averments of fact, and not consist of mere general allegations or conclusions based on information and belief, and must contain a full and unequivocal denial of the material allegations of the petition. Dawson v. Baldridge, 55 Tex. Civ. App. 124, 118 S. W. 593; McAnnis v. Railway, 184 S. W. 331.

The first allegation of the petition which the answer questions is the allegation that the appellant's street car system is reasonably worth the sum of $5,655,605. The denial of this allegation is as follows:

"Further answering these, defendants say that, according to their best information and belief, the properties of the said plaintiff company are not of the reasonable worth and value of $5,655,605, and such sum has not been invested in said property by the said company according to defendants' best information and belief, in such a manner as to entitle it to earn return thereon."

The allegation as to the value of the properties is not material in view of the other allegations which show that the earnings of the company are less than the cost of the service, but, if it were material, the denial is too equivocal and uncertain to be entitled to any consideration. The only other denial of any allegation of the petition is of the allegation that there has been no change in the unfavorable condition of the affairs of the company since the application for a higher rate was presented to the council. In denial of this application the answer avers that since the passage of the ordinance of September, 1918, authorizing appellant to charge a six-cent fare, an armistice has been signed, and hostilities in the World War have ceased, "and some, if not all, of the material necessary for the operation of said street railways have declined in price, and these defendants have reason to believe, and do believe, that conditions will be much more favorable in the near future." There is no averment as to the amount of decline in the price of material, and it is not alleged that the decline has been such that appellant can now maintain and operate its street cars without loss. The substance of this denial is that things are not quite as bad as they were, and defendants believe that conditions will improve in the near future. The answer further avers that the jitney competition has greatly decreased since 1915, and at the present it amounts to very little. The allegations of the petition show that such competition has greatly decreased since 1915, but that, notwithstanding this decrease, the appellant, by the operation of its railways in 1918, sustained a loss of more than $200,000. The further averment that this competition is now very little, and the earnings of appellant had reached practically its highest point, are too general and indefinite to be considered as an answer to the allegations of the bill showing the loss sustained by appellant in maintaining and operating its road under present conditions and being required to charge not more than a five-cent fare. The further consoling prophecy in the answer, that with the increased earnings brought about by the elimination of jitneys, and the probability of falling prices due to the termination of the war, appellant "should and could be able to earn sufficient to pay its fixed charges, set aside a reasonable replacement fund, and pay a reasonable net earning upon the amount invested," falls far short of being such a denial of the equities of the bill as to authorize the court to refuse relief. It is, I think, clear that the defendants, as stated in the ordinance passed by them on September 19, 1918, having after a full and complete investigation of the affairs of appellant, found that facts existed entitling it to temporary relief, could not and would not now deny the existence of such facts, but were only willing to swear that the conditions were not as bad as they were and they believed they would improve in the near future. Such an answer cannot justify a refusal to grant appellant relief by temporary injunction.

If the injunction is granted, and conditions should improve as appellees anticipate, the injunction could be dissolved at any time upon a showing that a five-cent fare was sufficient to enable appellant to maintain and operate its system and pay a reasonable dividend upon its investment.

I think the application for temporary injunction should have been granted.